IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>AARON LEE FISCHER,<br><br>  Defendant. | 4:19CR3095<br><br>**FINDINGS, RECOMMENDATION AND ORDER** |

Defendant Aaron Lee Fischer has moved to suppress all evidence obtained through a search of his cell phone. (Filing No. 22). Fischer claims that he was interrogated in custody without the benefit of Miranda[1] warnings, his statements were not voluntary, and the evidence derived from these Fifth Amendment violations must be suppressed. In addition, he claims two warrants were issued based upon information he revealed during custodial interrogation, and therefore any evidence derived from the searches conducted pursuant to those warrants must be suppressed. For the reasons contained herein, the motion to suppress should be denied.

STATEMENT OF FACTS

After hearing testimony, observing the witnesses, and reviewing the documentary and audio evidence, the undersigned magistrate judge finds the following facts are credible:

On May 10, 2019, Investigator Tyler Nitz of the Lincoln Police Department (LPD) applied a search warrant for Defendant's residence and car, both of which

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

were in Lincoln, Nebraska. (Filing No. 34-1 at CM/ECF p. 5) The warrant application alleged that a Lincoln Public School counselor reported a 13-year-old female student (hereafter "the victim") had stated she met an "older boy" at a park on May 4, 2019. The victim reported that she and the "older boy" went to his house and a sexual encounter took place. An LPS school resource officer reviewed the victim's cell phone and found a Snapchat video of the victim and an unknown white male driving in a car together. The male's face is visible in the video. A second video was saved on the victim's phone, and it depicts her performing fellatio on the man's penis. The victim was nude and her bare breast and buttocks were exposed. The video had been sent to the victim's phone in a text message on May 5, 2019. The victim exchanged text messages with the individual who sent the video, referencing the sexual encounter.

A search of the LPD records revealed Defendant's phone number was used for sending the images and videos. The defendant is a 26-year-old male. (Filing No. 34-1 at CM/ECF p. 6). Nitz reviewed Defendant's driver's license photo and positively identified Defendant as the white male depicted in the victim's snapchat post.

The victim was forensically interviewed on May 8, 2019. (Id.) She reported meeting an individual online named "Aaron Lee" who stated he was 17 years old. The victim reported telling Aaron Lee that she was 13 years old. The victim added Aaron Lee on Snapchat and the two exchanged multiple messages before meeting for the first time on May 4, 2019. The victim stated that she and Aaron Lee had sent and received nude images of each other through Snapchat. She sent images of her bare breast and bare vagina, and she received pictures of Aaron Lee's penis and videos of him masturbating.

The victim reported that she met Aaron Lee in a park on May 4, 2019 and they hugged and kissed in his car, a grey car with a loud stereo system. (Id.) Aaron Lee unzipped his pants while they were inside the car. The victim said she became

2

suspicious that Aaron Lee had not been truthful about his age, and when she questioned him, he said he was actually 18 years old. They went to Aaron Lee's residence. He undressed the victim and himself in his bedroom. The victim reported performing fellatio on his penis after he requested it, and she disclosed that they had penial/vaginal sex. (Filing No. 34-1 at CM/ECF p. 7). Aaron Lee told her not to tell anyone about what they had done because of their ages. The victim provided a physical description of Aaron Lee, and a description of the neighborhood, the house, and the bedroom. She confirmed that Aaron Lee recorded video of her performing fellatio on him. She reported that he had two cell phones, one with a cracked screen, and the other a Samsung. She asked him to send her the video, which she saved to her phone.

The warrant application alleged that on May 8, 2019, the LPD Electronics Evidence Unit conducted a forensic examination of the victim's phone with the victim's consent. (Id.) The Snapchat video of the victim and Defendant riding in the car together, and the video of her performing fellatio were on her phone. The second video contained metadata, including a GPS latitude and longitude for where the video was recorded. The GPS coordinates indicate the video was recorded at or near Defendant's address of record. (Filing No. 34-1 at CM/ECF p. 8). Officer Nitz located Defendant on Facebook. Defendant was using the account name Vivid Joey. The profile picture for Vivid Joey matched Aaron Lee Fischer's DMV photographs and the clothing he wore in his profile picture matched the clothing 'Aaron Lee' wore in the Snapchat video. The profile picture was posted the same day he met the victim.

A warrant was issued on May 10, 2019, which authorized Nitz to search Defendant's residence and car for a black cellular phone with a cracked screen, a Samsung cellular phone, an Apple iPhone SE, and certain other items including bedding, clothing, and proof of Defendant's residency or occupancy. (Filing No. 34-1 at CM/ECF p. 11).

On May 13, 2019, Nitz and Investigator Mike Barry interviewed Defendant outside his home. (Filing No. 24-1) The exchange between the investigators and Defendant was recorded and the audio transcribed. (Exhibit B, audio file). The investigators asked the defendant whether he wanted to make a comment. Defendant indicated that he did not. Nitz placed Defendant under arrest and informed him that a search warrant had been authorized to search his residence. (Filing No. 24-1 at CM/ECF pp. 7-8). Nitz asked if Defendant wanted to talk to him at the jail. Nitz indicated that if Defendant wanted to talk to him, he would go to the jail with him, but if Defendant did not intend to make a statement, Nitz would stay at the home and serve the search warrant. (Id. at 8). Defendant stated "probably - - probably not. I think it'd be in my best interest . . ." (Id. at 9). Nitz said "those are your rights, and that's - - and that's fine, I mean. I was just kind of givin' you an opportunity to - - to give me your side." (Id.)

Nitz and Defendant continued to talk, and Nitz informed Defendant that officers were "going to be taking some things from the house today." (Filing No. 24-1 at CM/ECF p. 13) Defendant said "I already know. I already assumed." Nitz informed Defendant that they would be seizing his cell phones, and he asked if Defendant would be willing to provide the passcode(s) for the phones. He said:

> Nitz: Kay uhm, one of those things that we are going to take is gonna be, uh, the cell phone. Uhm, you know, everyone has passwords for the phones now days. Uhm, we are gonna serve a search warrant on your phone separately to get inside of it. Uhm, we can crack PIN digits, uhm, but a lot of time it's beneficial if people will be willing to provide us their PIN's in lieu of the search warrant and that way once the search warrant is complete we don't have to hook it up to the break in machine. We can just . . .
>
> Fischer: break.
>
> Nitz: get into it. Would you be willin' to give us your PIN word . . .
>
> Fischer: (inaudible)
>
> Nitz: Your passcode?
>
> Fischer: (sigh)

4

> Nitz: It's completely up to you. I'm just I'm . . .
>
> Fischer: I know (inaudible) the search warrant will probably go through. It's just . . .
>
> Nitz: Yeah, we we're gonna go through it. It's just we have to hook it up to the PIN break in' machine if it has a PIN code. Uhm . . .
>
> Fischer: It's - - it's I don't even know what it would be right now. It's just straight up the middle."

(Filing No. 24-1 at CM/ECF pp. 13-14).

While executing the search warrant at Defendant's residence, Nitz observed computers and digital storage devices in. (Filing No. 37, audio file at 00:36:45) He planned to apply for a search warrant to search the contents of the phones once they were seized, and knew he would need another search warrant to return to the home for the devices not listed in the original warrant. (Id. at 00:37:00).

On May 14, 2019, Nitz applied for a second warrant to search two phones found in Defendant's residence during the search authorized by the first warrant. (Filing No. 24-2 at CM/ECF p. 5). The affidavit in support of the application included the same allegations of facts as the first application. It also alleged that two cellular phones were found on defendant's bed. (Filing No. 24-2 at CM/ECF p. 9). One was a black iPhone with a cracked screen, and the other appeared to be a Samsung in a black case, but it was determined to be a white LG phone. The application alleged these devices are "smart" phones, capable of storing large amounts of date, time, and location specific information and data, as well as audio and video. A search warrant was issued by Lancaster County Court judge on May 14, 2019, and it was executed on May 15, 2019. (Filing No. 24-2 at CM/ECF p. 12, Filing No. 24-3). This warrant authorized investigators to search the contents of the black iPhone and the white LG phone.

On May 15, 2019, Nitz applied for a third warrant to search Defendant's residence for additional electronic devices, including cellular phones, laptop computers, tablets, and external media storage devices. The affidavit in support of

the application included the same allegations as the first and second application. It also alleged that after the execution of the second warrant, it was determined that the black Apple iPhone was the phone used to record the video of the victim performing fellatio, however the video file was not found on the phone. (Filing No. 24-3 at CM/ECF pp. 8-9). Additionally, several images and videos of child erotica were found, as well as video of a female, who appeared to be under 18, masturbating. Nitz alleged that cell phones can be backed up to external storage devices and computers and that more than one device can be used to view, save, and record child pornography. (Id.) A search warrant was issued by a Lancaster County Court judge on May 15, 2019 commanding Nitz and LPD to search Defendant's residence for the electronic devices. (Filing No. 24-3 at CM/ECF p. 11-12).

On August 21, 2019, Defendant was indicted by the grand jury for the District of Nebraska in a four-count Indictment. Defendant was charged with production of child pornography in violation of 18 U.S.C. § 2251(a) and (2); distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2); possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(b); and, enticement of a minor in violation of 18 U.S.C. § 2422(b). (Filing No. 1)

On October 17, 2019, Defendant filed a motion to suppress any evidence derived from statements made during his arrest, and suppression of any evidence derived from search warrants based upon information Defendant gave to the officers on May 13, 2019. (Filing No. 22)

As explained by Investigator Corey Weinmaster of the LPD Electronic Evidence Unit, LPD uses several tools to unlock devices so investigators can perform a forensic analysis of the device's stored data. When a cell phone is seized by LPD, it is placed in a Faraday box to block the device from receiving a cellular signal, thereby preventing the device from being remotely erased or reset to its factory settings. (Filing No. 37, audio file at 1:31:00) The investigator then places

the phone into 'airplane mode,' if possible, or removes the SIM card to prevent the phone from connecting to a carrier. (Id. at 1:33:00).

Once the phone is unable to obtain any wireless connection, it is removed from the Faraday box and connected to an extraction tool used for determining the phone's PIN ("personal Identification Number"). (Id. at 1:34:30). A tool called "GrayKey" allows LPD to extract data from iOS devices, like Apple iPhones. If the phone has been shut off or the battery has died, it is considered to be "before first unlock." (Id. at 1:35:00) If the phone is "before first unlock," the tool can extract system files, but it may not get the "user data" it would get with a full extraction. (Id). A full extraction can be achieved if the PIN is discovered. (Id. at 00:1:36). To discover the PIN code, the extraction tool will try a different PIN every 10 minutes. (Id. at 1:37:00). When a 4-digit PIN has been used to secure a phone, there are 10,000 possible PIN combinations. (Id). When GrayKey discovers the PIN for the attached phone, a green light appears and the PIN will be printed at the bottom of the screen. (Id. at 1:38:00) An investigator can then use the extracted PIN to open the phone. The phone is then reconnected to the extraction tool to map the entire file system. (Id).

Fischer's iPhone SE had a 4-digit PIN. In such circumstances LPD's extraction tools are typically successful in discovering the PIN for seized phones. (Id. 1:41:00). If the first extraction tool is unsuccessful, the department will try another. As explained by Weinmaster on November 22, 201, particularly with older iPhones such as Defendant's, it is typically it is not a question of *whether* the investigators can identify the PIN; but *how long* it will take to do so. (Id. at 1:42:00)

At a subsequent hearing, on January 16, 2020, Weinmaster explained that he performed a forensic report on the black iPhone SE on May 14, 2019 based on information received from Nitz. ([Filing No. 49](Filing No. 49), audio file at 00:01:30). The iPhone SE was checked out to the Electronic Evidence Unit (EEU) on November 11, 2019. (Id. at 00:05:00). It was brought to the lab, removed from a manila envelope and

placed in the Faraday box. (Id. at 00:06:30). The phone had either been shut off or the battery was dead. (Id.) It was connected to power and charged enough to boot up and be placed into airplane mode. (Id. at 00:07:00). Then the phone was removed from the Faraday box and hooked up to GrayKey. (Id.) The phone was "before first unlock" so GrayKey began the process of testing four-digit PINs in an attempt to identify the PIN by "slow brute force." (Id at 00:08:00). Weinmaster placed a sticky note with his badge number and the case number on the phone and checked the phone periodically to see whether GrayKey had discovered the PIN. (Id. at 00:09:00). When Weinmaster checked the phone on November 26, 2019, the iPhone SE screen had changed from black to green, indicating that GrayKey had discovered the PIN. (Id. at 00:10:00) Weinmaster documented the PIN, uninstalled the GrayKey interface and rebooted the phone. (Id.) He then used the PIN identified through use of the GrayKey program to successfully unlock the phone. (Id). The user files stored on the phone in November 2019 were the same as the files that had been stored on the phone on May 2019, the only information that would have changed would be system files. (Filing No. 49, audio file at 00:13:00) He shut the phone off and checked it back into property.

## ANALYSIS

Defendant alleges his Fifth Amendment rights were violated. He argues that the statements he gave to law enforcement officers during the May 13, 2019 interview must be suppressed because he invoked his right to counsel prior to giving any statement, and because investigators questioned him without advising him of his <u>Miranda</u> rights. Defendant argues that his statements were not voluntarily given because he represented to the officers that he had recently been to the doctor, he was in pain, and he had not slept the night before. In addition, Defendant "posits that two warrants issued in the investigation against him were issued based on the tainted statement he made, and therefore, evidence derived from execution of the warrants should be suppressed as 'fruit of the poisonous

8

tree.'" (Filing No. 23 at CM/ECF p. 1). He argues that the evidence is subject to the exclusionary rule.

### A. Voluntariness, Miranda Advisement

The "statement" Defendant seeks to suppress is the statement in which he provided the PIN for accessing the iPhone SE to investigators. He argues that at the time the officer requested Defendant's PIN, the defendant was in custody and Miranda warnings were required. He states he was asked for the PIN without being advised of his Miranda rights.

Defendant argues that courts in other districts have ruled statements providing cell phone passwords and PINs are considered testimonial under the Fifth Amendment. Thus, he argues, his statements and the evidence obtained following these statements must be suppressed. The Eighth Circuit has not ruled on this issue.[2]

---

[2] For the reasons stated hereafter, I need not and do not address whether asking the defendant for his cell phone PIN was "interrogation" for the purposes of Miranda. Moreover, the parties did not mention the foregone conclusion doctrine discussed in this footnote. But rather than asking for additional briefing on a moot issue, I provide only the following comments on the application of the doctrine to the facts of this case.

Determining whether questions posed by law enforcement are interrogation—whether the response the questions will likely elicit information that is potentially incriminating and testimonial in nature--depends on the facts presented. Pennsylvania v. Muniz, 496 U.S. 582, 589 n. 14 (1990) (noting the routine booking exception to Miranda does not mean "that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's Miranda rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions."). See also, United States v. Parra, 2 F.3d 1058, 1068 (10th Cir. 1993) (holding questioning as to suspect's actual name was designed to elicit incriminating information useful to prove the defendant was an illegal alien in possession of a firearm).

As applied to requests for decryption, passcodes, and PINs, courts have held that providing such information is a testimonial act requiring Miranda warnings when the suspect's response would "require the use of the contents of [the target's] mind" and the disclosure could be incriminating. In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011, 670 F.3d 1335, 1337 (11th Cir. 2012). The Eleventh Circuit explained that since the government made no showing that files existed on the defendant's encrypted hard drives, what those files contained, and that the defendant could access those files, compelling the defendant to decrypt the hard drive would effectively state he had possession and control of the hard drive, and knowledge of its contents. But the Fifth Amendment does not protect a demand for decryption, or for disclosure of a PIN or a passcode to access documentary information "where any potentially testimonial component of accessing the document production—such as the existence, custody, and authenticity of evidence—is a 'foregone conclusion' that 'adds little or nothing to the sum total of the Government's

9

Defendant's arguments with regard to the voluntariness of his statements and the failure of the LPD investigators to provide a Miranda advisement will not be considered. These issues are moot for the reasons discussed in more detail, below.

B. Inevitable Discovery Exception to the Exclusionary Rule

"'Evidence obtained as a direct result of an illegal search and seizure, [and] evidence later discovered and found to be derivative of an illegality' will be suppressed unless an exception to the exclusionary rule permits admission of such evidence." Hogan v. Kelley, 826 F.3d 1025 (8th Cir. 2016). Under the inevitable discovery exception, evidence that "ultimately or inevitably" would have been discovered by lawful means" need not be suppressed. Id. citing Nix v. Williams, 467 U.S. 431 (1984). For this exception to apply, the government must prove by a preponderance of the evidence that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct and that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation. Id. See also, United States v. Lee, 356 F.3d 831, 835 (8th Cir. 2003).

---

information.' " United States v. Apple MacPro Computer, 851 F.3d 238, 247 (3d Cir. 2017) (quoting United States v. Hubbell, 530 U.S. 27, 30 (2000). See also, United States v. Norwood, 420 F.3d 888, 895 (8th Cir. 2005) (applying the foregone conclusion doctrine to a subpoena for production of tax records). The government bears the burden of proving the foregone conclusion doctrine, and it must be able to "describe with reasonable particularity" the documents or evidence it seeks to access through compelled disclosure of a device's pass code. Id. (denying a Fifth Amendment challenge and holding a suspect in contempt for failing to disclose the passcode to access child pornography known to exist on the suspect's hard drive).

    In other words, a request for a cell phone PIN is not, in all circumstances, interrogation for the purposes of Miranda. Here, as in Apple MacPro, the government proved through ample and credible evidence that prior to seizing Defendant's iPhone pursuant to a warrant, the defendant possessed, accessed, and owned the device; and when the officer requested the PIN, he knew the iPhone contained or very likely contained images of child pornography, including the images he saw on the victim's phone. Even assuming requesting a PIN could be construed as interrogation (while request for consent to search is not), the government has proved that under the circumstances presented, the PIN to Defendant's phone was not a testimonial statement because Defendant's possession, control, access to and knowledge of the phone's contents was a foregone conclusion.

The first warrant authorized officers to search Defendant's home for two cell phones. Nitz testified that once the phones were seized, he intended to obtain, and did obtain a second warrant to search the contents of those two phones. He told Defendant that the LPD had the ability to "break" into the phone using existing technology. Weinmaster testified that LPD had the ability discover the PIN for cell phones, like Defendant's iPhone SE, which circumvented the need for Defendant to provide the PIN for his phone.

At the first hearing on the motion to suppress, Weinmaster testified that when a phone like Defendant's is connected to the tools available to the LPD Electronic Evidence Unit, the variable is not whether the PIN is discoverable, it is *how long* the tools will take to discover it. When asked about the failure rate of the tools used to a discover a PIN, Weinmaster could not give an exact number, but stated that it was less than ten percent.

At the second hearing on the motion to suppress, Weinmaster testified that the lab keeps a log of incidences in which the officer is unable to use the tools available to unlock a phone. In cases where the tools failed, there may be other variables causing the failure, such as when the phone had been wiped prior to the police gaining access to it, or when the phone is damaged or the screen so cracked that the pin cannot be displayed properly once discovered. (Filing No. 49, audio file at 00:37:00). In this case, after being connected to GrayKey on November 11, 2019, the PIN was discovered on or before November 26 and was used to successfully unlock Defendant's phone. The user information available on the phone on that day would be the same information available to the officers in May 2019. The GrayKey technology used in November was also essentially the same as the GrayKey technology in May 2019. Thus, the prosecution affirmatively proved a reasonable probability that the information on the iPhone SE would have been inevitably discovered even without Defendant's disclosure of the PIN not

11

been received from Defendant. In fact, the government proved it was actually able to "break" into the phone without first knowing the PIN.

Even assuming the officers improperly questioned Defendant about the PIN prior to providing a Miranda advisement, the contents of the phone were accessible through alternate, legal means. Thus, the inevitable discovery exception renders the phone's contents admissible.

### C. Fruit of the Poisonous Tree

Following the execution of the first warrant, Nitz applied for a second warrant to search the contents of the phones. Following a search of the cell phones seized, Nitz applied for a third warrant for the contents of the home, specifically for electronic devices observed in the home during the execution of the first warrant. Defendant argues that the "question is whether the evidence obtained would have been eventually discovered without the password coming from Mr. Fischer." (Filing No. 23 at CM/ECF p. 7). Defendant argues that because law enforcement used "tainted" information to gain access to the phone, the execution of the warrant is also tainted. Thus, he concludes, that evidence derived from the execution of the second and third warrants should be suppressed.

Since the prosecution proved there was a reasonable probability that the information within Defendant's cell phone would have been inevitably discovered even had Defendant not provided the PIN, the second and third search warrants cannot be suppressed as fruit of any Fifth Amendment violation. For that reason alone, Defendant's motion to suppress the evidence obtained during the execution of the second and third warrants should be denied.

Moreover, the exclusionary rule is inapplicable when the connection between the constitutional violation and the evidence to be excluded is "so attenuated as to dissipate the taint;" when the Government shows that the evidence was acquired through a source independent of the taint. U.S. v. Swope,

542 F.3d 609 (8th Cir. 2008). (citing Nardon v. United States, 308 U.S. 338, 341 (1939)). To prove the warrants arose from an independent source, the government must show 1) the police would have applied for the warrants even had they not acquired the tainted information; and 2) with any tainted information redacted, the application affidavits still support a finding of probable cause. Murray v. United States, 487 U.S. 533 (1988); Swope, 542 F.3d at 614.

      Regardless of whether Nitz was given the PIN for Defendant's iPhone, the officer was planning to obtain warrant to search the contents of the phones. His request for the PIN was intended to speed up the process of accessing the iPhone once the warrant to search was granted. Nitz was aware at the time of his contact with Defendant that LPD possessed tools to access the iPhone without first knowing the PIN, and the warrant application stated that law enforcement processing and analysis of the phone would include "gaining access to the cellular telephone." Nitz knew from his investigation that the video of Defendant's sexual encounter with the victim had been distributed to the victim, and that the video she received had been filmed with an Apple iPhone SE at a location in the same vicinity as Defendant's residence. The phone obtained during the execution of the first warrant at Defendant's residence matched the make and model of the phone used to film the video. The forensic examination of the victim's phone took place before Nitz' first contact with Defendant, prior to acquiring any allegedly tainted information. All this information was obtained independent of Defendant's disclosure of the PIN, and that disclosure is not referenced in Nitz's application for the second warrant.

      Similarly, there is no reference to the PIN disclosure in Nitz's application for the third warrant for the computers and equipment in Defendant's home. The affidavit in support of Nitz's third application contains much of the same information as the first two applications, including the information obtained from the forensic evaluation of the victim's phone. However, Defendant argues that the third warrant,

issued May 15, 2019, for the second search of Defendant's home detailed information gained from the cell phone (as a result of having the PIN), to substantiate probable cause.

In his application for the third warrant, Nitz stated that during the execution of the first search warrant, investigators located a laptop computer, tablet, and external media storage devices inside of the home. Nitz's warrant application stated that cellular phones and similar electronics can be backed up to external media storage devices, with the observation that "more than one device can be used to view, save, and record child pornography." Additionally, Nitz stated the video on the victim's phone contained data indicating that it was filmed at or near Defendant's home and was sent from a cell phone number used by Defendant. Thus, even after redacting any information obtained from use of the PIN provided by Defendant, the third warrant application supported a finding of probable cause.

Defendant's motion to suppress the evidence obtained during the execution of the second and third warrant should be denied.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable John M. Gerrard, United States District Judge, pursuant to 28 U.S.C. § 636(b), that the motion to suppress filed by the defendant (Filing No. 22) be denied in its entirety.

The defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS ORDERED that the jury trial of this case is set to commence before John M. Gerrard, Chief United States District Judge, in Courtroom 1, United States Courthouse, Lincoln, Nebraska, at 9:00 a.m. on **March 30, 2020**, or as soon thereafter as the case may be called, for a duration of four (4) trial days. Jury selection will be held at the commencement of trial.

February 16, 2020.　　　　　　　　　BY THE COURT:

　　　　　　　　　　　　　　　　　　*s/ Cheryl R. Zwart*
　　　　　　　　　　　　　　　　　　United States Magistrate Judge